Nancy STRICKER, Tania Stricker, and Sharon Austin, Plaintiffs,

v.

CESSFORD CONSTRUCTION COMPANY and John Marks, Defendants.

No. C 00–30220MWB.

United States District Court, N.D. Iowa, Central Division.

Sept. 7, 2001.

Mark D. Sherinian of Mark D. Sherinian, P.C., West Des Moines, Iowa, Mindi M. Vervaecke of Fitzsimmons & Vervaecke Law Firm, P.L.C., Mason City, Iowa, for Plaintiffs.

Paul C. Peglaw of Johnson, Sudenga, Latham, Peglow & O'Hare, P.L.C. Marshalltown, Iowa, for Cessford Construction Co.

Mary E. Funk of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., Des Moines, Iowa, for John Marks.

MEMORANDUM OPINION AND OR-
DER REGARDING CROSS–MO-
TIONS FOR SUMMARY JUDG-
MENT OR PARTIAL SUMMARY
JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................... 993

II. LEGAL ANALYSIS ................................................ 995
 A. Standards For Summary Judgment ........................ 995
 1. Requirements of Rule 56 ......................... 995
 2. The parties' burdens ............................ 996
 B. Federal Claims ......................................... 996
 1. Sexual harassment ............................... 997
 a. The elements ................................ 997
 i. "Unwelcomeness." ...................... 997
 ii. Actionable harassment ................. 998
 b. The Ellerth/Faragher affirmative defense ...... 1001
 i. Availability of the defense ............. 1002
 ii. Elements of the defense ............... 1006
 2. Retaliation ..................................... 1011
 C. State Statutory Claims ................................. 1013
 1. Sexual harassment .............................. 1013
 a. Individual liability .......................... 1013
 b. Evidence of harassment ..................... 1016
 2. Retaliation ..................................... 1017
 D. State Common–Law Claims ............................. 1017
 1. Negligent supervision .......................... 1017
 2. Assault ........................................ 1019

III. CONCLUSION ................................................. 1021

Just who is entitled to summary judgment on the defendant's *Ellerth/Faragher* affirmative defense in this case involving alleged sexual harassment by a supervisor? That is one of several issues presented by the parties' cross-motions for summary judgment or partial summary judgment. The plaintiffs contend that the defendant employer cannot establish the affirmative defense as a matter of law, because of the patent inadequacy of the employer's anti-harassment policy. The employer, on the other hand, contends that it is entitled to summary judgment on the defense, and hence on the plaintiffs' harassment claims, because its policy was adequate, even if it wasn't perfect, the company made other efforts to prevent and correct harassment, and the plaintiffs never reported the harassment directly to any company official, despite opportunities to do so. The individual defendant, the plaintiffs' supervisor, contends that the *Ellerth/Faragher* affirmative defense is inapplicable to the plaintiffs' claims of sexual harassment in violation of Iowa law, and that one consequence of the inapplicability of the defense is that the plaintiffs cannot establish the elements of their claim against him, where the plaintiffs cannot show under pre-*Ellerth/Faragher* decisions of Iowa courts that the employer knew or should have known of alleged harassment. The court must decide which questions are

appropriate for determination by the court and which must be submitted to a jury.

## I. INTRODUCTION

In this action, filed April 10, 2000, plaintiffs Nancy Stricker, Tania Stricker, and Sharon Austin, who worked as "flaggers" for a road construction company, assert sexual harassment and other claims against their employer and supervisor. More specifically, in Count I of their complaint, asserted against defendant Cessford Construction, their employer, all three plaintiffs allege hostile environment sexual harassment in violation of Title VII, 42 U.S.C. § 2000e. In Count II, also against Cessford Construction, the plaintiffs allege retaliation in violation of Title VII after they reported sexual harassment. In Count III, against Cessford Construction and individual defendant John B. Marks, the plaintiffs' supervisor, the plaintiffs allege sexual harassment in violation of the Iowa Civil Rights Act (ICRA), Iowa Code Ch. 216. In Count IV, against Cessford and Marks, the plaintiffs allege retaliation in violation of the ICRA. In Count V, the plaintiffs allege negligent retention and supervision of Marks by defendant Cessford. In Count VI, the plaintiffs allege that the defendants' conduct constituted tortious infliction of emotional distress. All three plaintiffs also allege assault and battery by defendant Marks, in Counts VII and VIII, respectively. Finally, plaintiff Tania Stricker alleges pregnancy discrimination sexual harassment by Cessford in violation of Title VII and the ICRA, in Counts IX and X, respectively.

Some of these claims are no longer at issue, however. On July 18, 2001, plaintiff Tania Stricker accepted an offer of judgment by defendants Cessford and Marks, although plaintiffs Nancy Stricker and Sharon Austin did not. In light of Tania Stricker's acceptance of the offer of judgment, those portions of Counts I through VIII pertaining to Tania Stricker and Counts IX and X in their entirety are no longer at issue. Also, in their resistance to defendants' motions for summary judgment, the plaintiffs represented that, after reviewing the facts in support of their claim for intentional infliction of emotional distress, they were withdrawing that claim. Therefore, Count VI will be dismissed in its entirety. Thus, the claims still at issue are Nancy Stricker's and Sharon Austin's claims of sexual harassment and retaliation in violation of federal and state law in Counts I through IV, their claim of negligent retention and supervision in Count V, and their claims of assault and battery in Counts VII and VIII, respectively.

Although the cross-motions for summary judgment now before the court may require more detailed analysis of whether or not there are genuine issues of material fact on the remaining claims, for now, the court finds that it will suffice to present only sufficient of the undisputed and disputed facts to put the plaintiffs' claims and the motions for summary judgment in context. Those facts and allegations include the identity and relationship of the parties, the plaintiffs' allegations of sexual harassment and other wrongful conduct by the defendants, and some of the defendants' contentions raised in defense to the plaintiffs' claims.

Cessford Construction Company is an asphalt and aggregate business with its headquarters in LeGrand, Iowa. John B. Marks was the superintendent of one of Cessford's portable asphalt plants, Plant 3. Consequently, Marks was responsible for managing Plant 3 and its road construction projects. Plaintiff Sharon Austin was hired in April 1999 as a "flagger" for a road construction project involving Plant 3 on Highway 69 in Hancock County. Plaintiffs Nancy and Tania Stricker, mother

and daughter, began working for Cessford on May 9, 1999, as "flaggers" on the same project. One of the other foreman on the Highway 69 project was Marks's son, Kevin Marks, although Cessford contends that there were two other foremen present on the job site. Cessford contends that, at the time the plaintiffs were hired, each of them received an information packet that included information about the company's sexual harassment policy and how to contact Cessford's EEO officer, Joe McGuire, about claims of employment discrimination or harassment.

Almost as soon as they began working on the Highway 69 project, the plaintiffs contend that defendant John Marks subjected them to sexual harassment. Austin alleges that Marks hugged her on several occasions, kissed her on one occasion, grabbed her knee and attempted to run his hand up her leg, ran his hand along the side of her breast on two occasions, told inappropriate jokes, and told her he thought he could please her more than her boyfriend could. Nancy Stricker alleges that Marks also hugged her on three or four occasions, that she witnessed inappropriate conduct by Marks towards her pregnant daughter, Tania, and that one rainy day, Marks asked if he could suck her nipples dry. Marks later apologized for the last comment. However, Nancy Stricker quit her job after that incident. Tania Stricker was laid off at about the same time.

Neither Austin nor Stricker complained to management personnel about Marks's behavior. Austin did not complain to anyone at Cessford until she filed her civil rights charge with the Iowa Civil Rights Commission on or about July 2, 1999. Instead of complaining to Cessford's EEO officer or any other management employee at Cessford, Stricker complained to a coworker, Marv Baker, whom she was dat-

ing. Baker brought Stricker's complaints to the attention of Joe McGuire, Cessford's EEO officer, on June 9 or June 10, 1999.

In response to Baker's report, McGuire contacted Marks's supervisor, Pete Bjorkman, to ask that Bjorkman and Marks come to his office for a meeting on Friday, June 11, 1999. At the meeting, which was attended by Marks, McGuire, Bjorkman, and Steve Krabbe, the President of Cessford, the Strickers' complaints about Marks's behavior were discussed. On June 14, 1999, McGuire also interviewed Nancy and Tania Stricker and, Cessford contends, other workers at the job site. Based on McGuire's report on his investigation, Mr. Krabbe decided to terminate Marks. The plaintiffs contend that Krabbe "fired" Marks with the intention of rehiring him after their complaints had blown over. Also, on either June 21 or June 22, 1999, McGuire offered Nancy and Tania Stricker their jobs back.

After she returned to work, Nancy Stricker alleges that she felt that she was subjected to retaliatory conduct and angry looks by coworkers. Also, the plaintiffs complain that at a meeting of all of the Cessford employees at the job site, McGuire told all of the employees that the Strickers and Baker had done what they were supposed to do, and informed the other employees that the Strickers had hired an attorney to represent them, which Nancy Stricker testified in her deposition made her feel "awkward." Despite alleged retaliation, Nancy Stricker continued to work for Cessford until the Highway 69 project was concluded and she was no longer needed. Austin left her job at Cessford in August of 1999 when she moved to Kansas with her boyfriend.

This action comes before the court pursuant to the following motions: (1) the plaintiffs' motion for partial summary judgment on defendant Cessford's *El-*

*lerth/Faragher* affirmative defense to federal claims of sexual harassment; (2) defendant Cessford Construction Company's motions for summary judgment on the claims against it; and (3) defendant Marks's motion for partial summary judgment on all but one of the plaintiffs' claims against him. The court heard oral arguments on the cross-motions for summary judgment or partial summary judgment on August 28, 2001. At the oral arguments, plaintiffs were represented by Mark D. Sherinian of Mark D. Sherinian, P.C., in West Des Moines, Iowa, and Mindi M. Vervaecke of Fitzsimmons & Vervaecke Law Firm, P.L.C., in Mason City, Iowa. Defendant Cessford Construction Company was represented by Paul C. Peglow of Johnson, Sudenga, Latham, Peglow & O'Hare, P.L.C., in Marshalltown, Iowa. Defendant John Marks was represented by Mary E. Funk of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., in Des Moines, Iowa.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank*

*v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards are as follows.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906

F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

### 2. The parties' burdens

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston,* 133 F.3d at 1107; *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

The parties' cross-motions for summary judgment involve all of Nancy Stricker's and Sharon Austin's remaining claims, except their claims against Marks for battery in Count VIII. The court finds that consideration of the cross-motions for summary judgment *claim-by-claim,* rather than *motion-by-motion,* is more likely to produce a coherent analysis of whether or not there are genuine issues of material fact on each of the remaining claims that a jury must resolve. Therefore, the court turns first to consideration of the cross-motions for summary judgment regarding the plaintiffs' federal claims.

### B. Federal Claims

Remaining plaintiffs Nancy Stricker and Sharon Austin assert sexual harassment and retaliation in violation of Title VII. They have moved for partial summary judgment on Cessford's *Ellerth/Faragher* affirmative defense to liability for alleged sexual harassment by the plaintiffs' supervisor, Marks. However, Cessford has also moved for summary judgment on Stricker's and Austin's sexual harassment claim on the ground that the plaintiffs will be

unable to generate a genuine issue of material fact on either the elements of their harassment claims or Cessford's *Ellerth/Faragher* affirmative defense. Cessford also contends that the plaintiffs cannot generate genuine issues of material fact that they were subjected to any adverse employment action as a result of their complaints about sexual harassment as required for submission of their retaliation claims to a jury.

### 1. Sexual harassment

### a. The elements

■ A sexual harassment claim alleging a hostile work environment, such as the plaintiffs assert here, "requires a showing that (1) [the plaintiff] is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; and (4) the harassment was sufficiently severe or pervasive as to alter a term, condition, or privilege of employment." *Schoffstall v. Henderson*, 223 F.3d 818, 826 (8th Cir. 2000) (citing *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 n. 5 (8th Cir.1998)); *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 736 (8th Cir.2000) (identifying the same elements); *see also Clearwater v. Independent Sch. Dist. No. 166*, 231 F.3d 1122, 1128 & n. 7 (8th Cir.2000) (identifying the same four elements, but adding a fifth element, requiring proof that the employer knew or should have known of the harassment, for an employer to be liable for the harassment).[1] Here, Cessford contends that neither Nancy Stricker nor Sharon Austin can establish that John

Marks's allegedly harassing conduct was "unwelcome," because neither complained about his conduct to company officials. Cessford also contends that these plaintiffs cannot generate a genuine issue of material fact that Marks's alleged conduct affected a term, condition, or privilege of employment, because his conduct was neither severe nor pervasive enough. The plaintiffs, not surprisingly, disagree.

■ *i. "Unwelcomeness."* First, as to the "unwelcomeness" element, the Eighth Circuit Court of Appeals has explained, "That the conduct in question is unwelcome is '[t]he gravamen of any sexual harassment claim.'" *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1108 (8th Cir.1998) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Therefore, "[a] plaintiff must indicate by her conduct that the alleged harassment was unwelcome." *Hocevar*, 223 F.3d at 736. "Conduct is 'unwelcome' where it is 'uninvited and offensive.'" *Bales*, 143 F.3d at 1108 (quoting *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir.1996)). Moreover, "This is a fact question for the jury and 'will turn largely on credibility determinations.'" *Id.* (again quoting *Quick*, 90 F.3d at 1378). There is simply no requirement that the plaintiff have reported the conduct to company officials to establish that the conduct was "unwelcome," as Cessford argues.

The court finds that the plaintiffs have generated genuine issues of material fact on the "unwelcomeness" element of their

---

**1.** In *Clearwater*, after identifying the "knew or should have known" element, the court noted that a plaintiff may also establish that the employer is vicariously liable under the standards established in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), but that vicarious liability was not at issue in the case before it.

*See Clearwater*, 231 F.3d at 1128 & n. 7; *see also Faragher*, 524 U.S. at 789 & 810, 118 S.Ct. 2275 (identifying the "knew or should have known" standard as a negligence standard for employer liability that is an alternative to the vicarious liability standard established in that case).

federal harassment claims by designating "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. Genuine issues of material fact here are apparent from the plaintiffs' testimony that they were offended by Marks's conduct, that the conduct was uninvited and unsolicited, and that they repelled many of Marks's physical contacts with them by slapping Marks's hands or moving out of his reach and telling him to stop the offending conduct. This record evidence is more than sufficient to generate genuine issues of material fact on the "unwelcomeness" element of the plaintiffs' harassment claims.

 **ii. Actionable harassment.**
As to proof that the harassment affected a term or condition of employment, the Eighth Circuit Court of Appeals has also explained, "To be actionable, a 'sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Stuart v. General Motors Corp.,* 217 F.3d 621, 631 (quoting *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275, which in turn cites *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Thus,

> In determining whether the alleged harassment is actionable, the totality of the circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [*Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999).] "More than a few isolated incidents are required." *Meri-*

*tor Savs. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49(1986). *Clearwater,* 231 F.3d at 1128 (correcting erroneous page citation to *Carter* ); *Hocevar,* 223 F.3d at 737 (identifying the same considerations to determine whether harassment is sufficiently severe and pervasive). The plaintiffs have again generated genuine issues of material fact from record evidence under this standard, *see* FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325.

In their statement of material facts in support of their motion for partial summary judgment, the plaintiffs allege that the following facts are undisputed:

> 17. From the commencement of their employment through June 8, 1999, the Plaintiffs allege that they experienced numerous events of sexual harassment by their supervisor, J.B. Marks. This harassment came in the form of unwanted sexual touching and vulgar comments. He rubbed and grabbed Sharon's breast on two separate occasions. On a rainy day, he ran his hand up her thigh toward her crotch and asked her how high up she was wet. He frequently put his arm around her tightly from behind and attempted to rub her back. He asked Sharon to come back to his trailer with him and indicated that he could please her more than her boyfriend could. He asked her what undergarments she was wearing. On more than one occasion he grabbed Tania's pregnant stomach and asked her if it hurt to have sex. On a rainy day he asked Nancy if she was wet, where she was wet and if he could suck her nipples dry. He hugged all of them numerous times.

Plaintiffs' Statement Of Undisputed Material Facts, ¶ 17 (citations to the record

omitted). The defendants dispute the truthfulness of these allegations. *See* Defendant Cessford Construction Company's Response To Statement Of Material Facts Filed By Plaintiffs, ¶ 17; Defendant Marks's Response To Plaintiffs' Statement Of Material Facts And Statement Of Undisputed Material Facts In Support Of His Motion For Summary Judgment, § I (adopting Cessford's response to the plaintiffs' statement of undisputed facts).

However, Cessford's statements of undisputed facts in support of its own motions for summary judgment and the plaintiffs' responses provide even more detailed summaries of the plaintiffs' deposition testimony concerning Marks's harassment. As to Nancy Stricker, Cessford states the following:

22. Nancy Stricker's daughter, Tania Stricker, was pregnant. On perhaps three occasions, Mr. Marks put his hand on Tania's stomach and asked if the baby was kicking. Tania would say no. Nancy Stricker did not make any complaints of the conduct. She realized a lot of people, when they know someone is pregnant, think that it is kind of neat and she thought maybe Marks enjoyed little kids. She did not really think a whole lot about it at the time.

23. Mr. Marks on occasion would put his arm around the shoulder or waist of female employees when he would talk to them. He did this to Nancy Stricker on three or four occasions when she worked at Cessford. She did not say anything to Mr. Marks, but did feel uncomfortable.

24. On one occasion, Nancy Stricker heard Mr. Marks ask her daughter, Tania Stricker, if it hurt when she had sex. Nancy Stricker told Mr. Marks that was a pretty sick thing to be asking Tania. Tania Stricker did not say anything to Mr. Marks about the comment.

25. On or about June 8, 1999, Mr. Marks came up to Nancy Stricker while she was flagging. It was raining that day. Mr. Marks motioned her over to his truck and asked her if she was wet. She told him she was wet all over and he asked if he should suck her nipples dry. She slammed his pickup door shut. Mr. Marks opened the door and said he had made a remark to Sandy that he was going to throw her out in the rain for a wet t-shirt contest and that she had just laughed and called him a dirty old man. Nancy Stricker did not make any response to that comment. It was this comment that Nancy Stricker thought was really bad.

Defendant Cessford Construction Company's Statement Of Material Facts In Support Of Motion For Summary Judgment Against Plaintiff Nancy Stricker, ¶¶ 22–25 (citations to the record omitted). Nancy Stricker's response to this characterization of her deposition testimony consists of the following:

22. Plaintiff qualifies paragraph no. 22 and states that Sharon Austin also did not like the fact that Mr. Marks could hug them.

23. Plaintiff qualifies paragraph no. 23. and states that while Tania did not verbally complain to Mr. Marks, she moved away from him when he touched her pregnant stomach to show him her dislike for this. In addition, Tania did not let just anyone touch her pregnant stomach and testified that only her best friend and her mother had done so in the past.

24. Plaintiff qualifies paragraph no. 24 and states that while Tania did not say anything verbally to Mr. Marks when he put his arm around her and touched her, she showed Mr. Marks her dislike of it through her actions b[y] trying to step back away from him.

25. Plaintiff qualifies paragraph no. 25 and states that Mr. Marks asked her whether it hurt to have sex three times in the same day and that Nancy Stricker could see that Tania was scared and stunned by this question. Furthermore, while Nancy states that the comment regarding having her nipples sucked dry was really bad, the hugging was bad also and she would have quit if that had it had [sic] continued.

Plaintiffs' Response To Defendants' Statement Of Material Facts, Statement Of Facts Re: Nancy Stricker, ¶¶ 22–25 (citations to the record omitted).

Cessford's summary of Sharon Austin's deposition testimony concerning harassment consists of the following:

17. Ms. Austin's complaints against J.B. Marks, the Superintendent of the project and her supervisor, are as follows:

1. On the second day of work he put his arm around her shoulder and drew her close when he was talking to her about a raise. He kissed the hair on the side of her face. She thought maybe he was a "touchy-feely" person. She made no complaint to him.

2. The third day of work he put his arm around her shoulder and drew her close. She did not complain.

3. Mr. Marks frequently in the morning would put his arm around her shoulder and hug her. He did this with other flaggers, too. She told him not to do that to her five to six times. When she would tell him that, he would let go of his grip and just keep on talking to her.

4. One time while it was raining outside Forest City, she had a rain coat on. She was in the pilot truck, sitting. He reached in and grabbed her knee and asked her how high

up she was wet. She smacked his arm and told him not to touch her that way. He removed his hand.

5. On one occasion her safety vest was twisted. She did not realize it. He straightened it out and in doing so ran his hand along the side of her breast. She told him to stop that.

6. On one occasion he told a joke about a woman being on her period. He later apologized for the joke.

7. Mr. Marks told her that he thought he could please her more than her boyfriend.

8. Another time they were in Forest City and she was in the pilot truck. He was leaning in the window talking to her. His right hand rubbed against the side of her left breast. She said stop it in a mad tone. He stopped.

Defendant Cessford Construction Company's Statement Of Material Facts In Support Of Motion For Summary Judgment Against Plaintiff Sharon Austin, ¶ 17 (citations to the record omitted). Sharon Austin admits the facts contained in this paragraph of Cessford's statement of facts, but contends that there were other incidents of sexual harassment not listed. Plaintiffs' Response To Defendants' Statement Of Material Facts, Statement Of Facts Re: Sharon Austin, ¶ 17 (citations to the record omitted). She does not then list such other incidents herself or provide citations to record evidence of other such incidents. *Id.* She does, however, "clarif[y] that Mr. Marks did not merely grab Plaintiff's knee but ran his hand up her leg to her privates." *Id.* (citations to the record omitted).

In light of this record, as summarized by the parties and verified by the court from the parties' citations to the record, the

plaintiffs have generated genuine issues of material fact that they were subjected to a subjectively and objectively harassing environment. Their testimony is that Marks's conduct occurred almost daily, was physically offensive and humiliating, and that certain kinds of conduct, such as hugging, offensive comments, and attempts to contact private parts of their persons, were repeated even after they asked Marks to stop the conduct the first time. *See Clearwater,* 231 F.3d at 1128 (identifying factors to determine whether an actionable hostile environment existed); *Hocevar,* 223 F.3d at 737 (identifying the same considerations to determine whether harassment is sufficiently severe and pervasive). The plaintiffs are also correct that the Eighth Circuit Court of Appeals has recognized that harassment directed at others of which the plaintiff is aware can constitute evidence of a hostile environment as to the plaintiff. *See Madison v. IBP, Inc.,* 257 F.3d 780, 793 (8th Cir.2001) ("Here, Madison introduced evidence that other women and African American employees .were also discriminated against and harassed. This evidence was relevant as to whether IBP maintained a hostile work environment, whether it intended to harass and discriminate against women and African Americans, and whether IBP's justifications for its refusal to discipline Madison's harassers or to promote her were pretextual."). Thus, the plaintiffs' testimony that they were aware of and offended by conduct directed at others is also relevant to the question of the hostility of the environment to which they were subjected. There is little doubt that the conduct identified in the plaintiffs' depositions was subjectively offensive to the plaintiffs, and the totality of the record evidence certainly generates a genuine issue of material fact on whether the conduct was objectively offensive as well.

*Clearwater,* 231 F.3d at 1128; *Hocevar,* 223 F.3d at 737; *Stuart,* 217 F.3d at 631.

In light of these genuine issues of material fact, Cessford is not entitled to summary judgment on Nancy Stricker's or Sharon Austin's federal harassment claims on the ground that the plaintiffs cannot establish the elements of their claims. Therefore, the court turns to the plaintiffs' and Cessford's cross-motions for summary judgment on Cessford's *Ellerth/Faragher* affirmative defense to the plaintiffs' federal harassment claims.

**b. The Ellerth/Faragher affirmative defense**

■ Under Title VII, an employer has an affirmative defense to liability or damages caused by the harassment of an employee when there is no "tangible employment action," if (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Hocevar,* 223 F.3d at 736 (citing *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275 (1998)); *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Cessford contends that it is entitled to raise this affirmative defense, because the only potential "tangible employment action" the plaintiffs have identified is a "constructive discharge," and Cessford contends that neither plaintiff can generate a genuine issue of material fact that she was "constructively discharged." Furthermore, Cessford contends that there is no genuine issue of material fact that the remaining plaintiffs unreasonably failed to take advantage of the preventive or corrective opportunities Cessford provided through its sexual harassment policy—a copy of which was

given to each of them at the time they were hired—by failing to contact any company official with their complaints. Cessford also contends that its sexual harassment policy was reasonably adequate, even if it wasn't perfect, and that Cessford acted promptly to correct the harassment by firing Marks as soon as the plaintiffs' complaints were brought to its attention and it had performed a prompt investigation. The plaintiffs contend that they, not Cessford, are entitled to summary judgment on the affirmative defense based on the patent inadequacy of Cessford's efforts to prevent harassment, because no *adequate* policy was ever effectively disseminated to them, which also left them without any effective way to take advantage of the company's policy.

***i. Availability of the defense.*** On the question of whether or not Cessford is entitled to raise the *Ellerth/Faragher* affirmative defense, the court agrees that the only allegation of a "tangible employment action" in this case appears to be Nancy Stricker's assertion that she was constructively discharged. This court has held that a "constructive discharge" may constitute a "tangible employment action" depriving a defendant of the *Ellerth/Faragher* defense. *See Cherry v. Menard, Inc.*, 101 F.Supp.2d 1160, 1171–77 (N.D.Iowa 2000) (rejecting the contrary holding of the Second Circuit Court of Appeals in *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283 (2d Cir.1999), *cert. denied*, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000)). The Eighth Circuit Court of Appeals has also intimated that this is so. *See Phillips v. Taco Bell Corp.*, 156 F.3d 884, 889 & n. 6 (8th Cir.1998) (noting that the plaintiff had not been constructively discharged, "nor did she suffer *any other* tangible detrimental employment action," so that the *Ellerth/Faragher* affirmative defense was available in that case) (emphasis added). Thus, the availability of the

affirmative defense here depends upon whether or not the remaining plaintiffs can generate a genuine issue of material fact that they were constructively discharged.

 As the Eighth Circuit Court of Appeals has explained,

> Under Title VII, "[a] constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit." *Johnson v. Runyon*, 137 F.3d 1081, 1083 (8th Cir.) (per curiam) (internal quotations omitted), *cert. denied*, 525 U.S. 916, 119 S.Ct. 264, 142 L.Ed.2d 217 (1998). A successful claim requires more than simply showing that an employer's actions have violated Title VII. *Hutchins [v. International Bhd. of Teamsters]*, 177 F.3d [1076,] 1082 [ (8th Cir.1999) ]. The employee's decision to resign must be reasonable in light of the circumstances; we have stressed that "[t]o act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." *Coffman [v. Tracker Marine, L.P.]*, 141 F.3d [1241,] 1247 [ (8th Cir.1998) ] (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996)). The employee must allow the "employer a reasonable opportunity to work out a problem." *Id.*

*Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685 (8th Cir.2001).

 In this case, there is no genuine issue of material fact on the question of whether or not Sharon Austin quit as a result of intolerable conditions. *Id.* Rather, Austin admitted that she quit only when she decided to move to Kansas with her boyfriend. *See* Defendant Cessford Construction Company's Statement Of Material Facts In Support Of Motion For Summary Judgment Against Plaintiff Sharon Austin, ¶ 30 ("Ms. Austin worked

into August, but then left to go to Kansas, because her boyfriend Lundholm wanted to move back there."); Plaintiff's Response To Defendants' Statement Of Material Facts, Statement Of Facts Re: Sharon Austin, ¶ 30 (admitting ¶ 30 of the defendant's statement of facts). Because Austin has not generated any genuine issue of material fact that she was constructively discharged, she has not generated a genuine issue of material fact that she suffered a "tangible detrimental employment action" that would deprive Cessford of the *Ellerth/Faragher* affirmative defense.

■ However, the question of whether or not Nancy Stricker was constructively discharged is more complicated. Cessford contends that there is no evidence that Stricker "allow[ed] the employer a reasonable opportunity to work out a problem," *Sowell*, 251 F.3d at 685 (internal quotation marks and citation omitted), where she admitted that she decided to quit immediately after Marks made the comment concerning sucking her nipples dry, she did not return to work after that day, and she did not inform any company official of Marks's comment or give the company any opportunity to address the problem *before quitting*. *See* Defendant Cessford Construction Company's Statement Of Material Facts In Support Of Motion For Summary Judgment Against Plaintiff Nancy Stricker, ¶¶ 26 ("Nancy Stricker made up her mind right then and there that she was going to quit."), 27 ("Nancy Stricker did not go to work the following day."), 28 ("[S]he did not report anything to any authorities."); Plaintiffs' Response To Defendants' Statement Of Material Facts, Statement Of Facts Re: Nancy Stricker, ¶¶ 26–28 (admitting the pertinent paragraphs of defendant Cessford's statement of facts). However, Stricker argues that, before she left the work site, she told Kevin Marks, the alleged harasser's son

and the other foreman on the site, that she was quitting and that he could call her to find out why, but that Kevin Marks never called her. She contends that she thereby gave Cessford the opportunity to rectify the misconduct that caused her constructive discharge. Nevertheless, it is undisputed that Stricker provided this notice *at the time she quit*, without allowing Cessford any prior opportunity to work out the problem. *See Sowell*, 251 F.3d at 685 ("The employee must allow the 'employer a reasonable opportunity to work out a problem.' ") (quoting *Coffman*, 141 F.3d at 1247).

■ A constructive discharge is measured against a "reasonableness" standard: The question is whether "[t]he employee's decision to resign [was] reasonable in light of the circumstances" and "the employee must allow the 'employer a reasonable opportunity to work out the problem.' " *Id.* Stricker contends that she took the only reasonable course she could when she simply quit and told Kevin Marks to call her to find out why, because there was no effective means for complaining about sexual harassment available at Cessford.

The Eighth Circuit Court of Appeals has rejected the constructive discharge claims of employees who "abruptly quit," reasoning that "[i]t is difficult to find a[n] employee's resignation objectively reasonable and subject an employer to liability for constructive discharge when the employee quits without giving her employer a chance to fix the problem." *Williams v. City of Kansas City, MO.*, 223 F.3d 749, 754 (8th Cir.2000). Therefore, in *Williams*, because the employee did not permit her employer to address her concerns, the court could not find that the employee's "only plausible alternative was to resign." *See id.* Similarly, in *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678 (8th Cir.2001), the court held that the

plaintiff had failed to establish a constructive discharge, because she "failed to avail herself of the channels of communication provided by [the employer] to deal with ... complaints," where she made only one complaint about a new work policy—to come to work if paged—with which she believed she could not comply, because she had a newborn infant. *Sowell,* 251 F.3d at 685. The court found that the plaintiff "took no further steps to exempt herself from [the pager policy's] requirements, such as getting a note from her doctor regarding her infant's needs or approaching human resources about the policy itself or about flexible work arrangements." *Id.* at 685–86. However, it seems to the court that the decisions in *Williams* and *Sowell* are premised on an assumption or finding that there were *available* and *effective* "channels of communication provided by [the employer] to deal with ... complaints." *Id.* at 686; *Williams,* 223 F.3d at 754 ("[W]e cannot say that Williams['s] only plausible alternative was to resign."); *see also Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 574 (8th Cir.1997) ("[i]f an employee quits because she reasonably believes that there is no chance for fair treatment, there has been a constructive discharge").

Useful contrasts can be made between the circumstances presented here and those presented in another case in which the Eighth Circuit Court of Appeals concluded that the plaintiff could not establish a constructive discharge, *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241 (8th Cir.1998). In *Coffman,* the court found no sufficient evidence of a constructive discharge for the following reasons:

> Our review of the evidence convinces us that Coffman failed to present sufficient evidence for a jury to find that a reasonable person in Coffman's position would have found that the conditions of her employment were intolerable. Coffman was not an employee who felt she had no place to turn when faced with unlawful discrimination. She knew that she could report any allegations of retaliatory action directly to McNew and up the chain of responsibility to Rowland. When Coffman threatened to quit, Rowland tried to prevent her resignation and attempted to solve the problems. Although his proposed solution may not have been prompt and appropriate when viewed through the 20/20 lens of hindsight, Coffman had an obligation to not jump to the conclusion that the attempt would not work and that her only reasonable option was to quit. *See Tidwell [v. Meyer's Bakeries, Inc.],* 93 F.3d [490,] 494 [ (8th Cir.1996) ]. Nor did she have the right to dictate how Tracker Marine would try to solve the problem by insisting on an "outside" facilitator. This obligation [not to jump to conclusions] is particularly appropriate here because Rowland had taken corrective action on Coffman's prior sexual harassment complaint, and Coffman had little reason to believe that her retaliation complaint would not lead to similar corrective action by Tracker Marine. Her most recent performance review given to her by the retaliator had been favorable. There is also no evidence that the retaliatory acts were intended by Tracker Marine to force Coffman to quit, or that it was reasonably foreseeable that she would quit as a consequence of the retaliation. *See id.; [Johnson v.] Bunny Bread,* 646 F.2d [1250,] 1256 [ (8th Cir.1981) ]. The evidence here all points the other way—when Coffman threatened to quit, Tracker Marine tried to take action to prevent her resignation.

*Coffman,* 141 F.3d at 1247–48. Unlike the plaintiff in *Coffman,* Nancy Stricker has presented evidence that she *was* "an employee who felt she had no place to turn

when faced with unlawful [harassment]." As explained more fully below, Stricker points out that Cessford's anti-discrimination policy did not address "harassment" and did not provide her with information about how to contact the person identified as the EEO officer for the company. She also felt that there was no one in authority at the job site to whom she could report harassment, because Marks, the harasser, was her supervisor and Marks's son was the other foreman that she knew of on the job site. Thus, unlike the plaintiff in *Coffman*, Stricker has pointed to evidence that she *did not know* "that she could report any allegations of [harassment] directly to [Cessford] and up the chain of responsibility to" McGuire, the EEO officer, or any other management employee of Cessford. Nor is there any evidence of a "track record" of some response to harassment by Cessford from which Stricker could have been aware that the company would attempt to prevent and correct harassment, such that she would have "little reason to believe that her [harassment] complaint would not lead to similar corrective action." *Compare Coffman*, 141 F.3d at 1247–48 (recounting past responses by the company to the plaintiff's complaints and threats to resign). Rather, Stricker contends that she saw frequent, unaddressed harassment by Marks towards female workers on the job site. In this case, it cannot be said that "[t]he evidence here all points the other way" towards a conclusion that Cessford would take action to prevent Stricker's resignation. *Id.* at 1248; *see also Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991) (summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion").

Moreover, the Eighth Circuit Court of Appeals recently explained that a plaintiff asserting a constructive discharge "is required to prove that the [employer] knew or should have known of the alleged harassment, because '[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.'" *Willis v. Henderson*, 262 F.3d 801, 810 (8th Cir. 2001). This decision suggests that, if the plaintiffs can show that Cessford "knew or should have known" of Marks's improper conduct, even in the absence of their reporting such conduct to company officials, then they will have established that, or at least will have generated a genuine issue of material fact as to whether, Cessford had been given a reasonable chance to work out the problem with Marks's conduct before they quit. It seems to the court that it makes little sense to require a plaintiff to report harassment to the employer when the circumstances demonstrate that the employer already knew or should already have known of the harassment, and had failed to take appropriate action, in order to establish that the plaintiff gave the employer an opportunity to correct the problem, because such evidence of the employer's knowledge and inaction is indicative of the employer's deliberate creation of intolerable working conditions and intention to force employees to quit by subjecting them to such conditions. Here, there is at least some slight inference that Cessford already knew or should have known of Marks's harassing conduct, because Marks's immediate supervisor had received warnings that Marks had proclivities for inappropriate conduct toward women and had received warnings about Marks from previous complaints by a female motorist, Ms. Poe, and another employee, Ms. Zesch.

In short, the court concludes that Nancy Stricker has generated genuine issues of material fact that she was constructively

discharged and, hence, whether or not she suffered a "tangible detrimental employment action." Thus, there are fact questions that must be resolved by a jury before the availability to Cessford of the *Ellerth/Faragher* defense to Stricker's sexual harassment claims can be determined. However, because there is no evidence that Sharon Austin suffered a constructive discharge, or any other "tangible detrimental employment action," the *Ellerth/Faragher* affirmative defense to Austin's federal harassment claim is available to Cessford as a matter·of law.

■■■■ *ii. Elements of the defense.* Because Cessford can raise the *Ellerth/Faragher* defense to the federal harassment claim by Austin, and may be able to raise that defense to the federal harassment claim by Stricker, the question becomes whether any party is entitled to summary judgment on that defense. Again, the elements of the defense require the employer to establish the following: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Hocevar*, 223 F.3d at 736 (citing *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275 (1998)); *see also Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. Thus, the first element of the defense examines the *employer's* conduct with regard to preventing *and* correcting harassment, while the second element examines the *employee's* conduct in response to harassment. The parties contend that summary judgment on the defense in this case turns in large part—if not entirely—on the adequacy of Cessford's anti-harassment policy, as establishing or disproving the first element of the defense.

■■■■ The Supreme Court noted that "[w]hile proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Phillips*, 156 F.3d at 889. Consequently, the Fourth Circuit Court of Appeals has reasoned that "an employer can meet its burden as to the first element without such a policy, *Faragher*, 118 S.Ct. at 2293; *Burlington*, 118 S.Ct. at 2270, and that mere promulgation of such a policy may well fail to satisfy the employer's burden." *See Brown v. Perry*, 184 F.3d 388, 396 (4th Cir.1999); *see also Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1028 (10th Cir.2001) (citing *Brown* in holding that, although a policy existed, the employer failed to satisfy its burden to prove the defense); *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313–14 (11th Cir.2001) ("[A]s to the first part of the first element of the *Faragher/Ellerth* affirmative defense, an employer does not always have to show that it has a formal sexual harassment policy to meet its burden of proof on this element. At the same time, an employer's showing that it has a sexual harassment policy does not automatically satisfy its burden.") (citations omitted); *Gentry v. Export Packaging Co.*, 238 F.3d 842, 847 (7th Cir.2001) ("[T]he mere creation of a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace."); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244 (4th Cir.2000) (citing *Brown* for the circuit's standard in light of *Ellerth* and *Faragher*). The test for an adequate policy is that "[t]he employer must act reasonably, and thus any policy adopted by the em-

ployer must be both reasonably designed and reasonably effectual." *Id.*

In *Miller v. Woodharbor Molding & Millworks, Inc.,* 80 F.Supp.2d 1026 (N.D.Iowa 2000), *aff'd,* 9 Fed.Appx. 557, 2001 WL 388809 (8th Cir.2001) (table opinion), this court identified the requirements for an "effective" anti-harassment policy as including (1) training for the company's supervisors regarding sexual harassment; (2) an express anti-retaliation provision; and (3) multiple complaint channels for reporting the harassing conduct. *Miller,* 80 F.Supp.2d at 1029. More recent decisions of the Circuit Courts of Appeals are in accord with these requirements for an adequate anti-harassment policy. *See Kohler v. Inter–Tel Techs.,* 244 F.3d 1167, 1180 (9th Cir.2001) (upholding the sufficiency of a policy that "(1) provides a definition of sexual harassment, (2) identifies whom employees should contact if they are subjected to sexual harassment, (3) ensures that harassing supervisors can be bypassed in registering complaints, (4) describes the disciplinary measures that the company may use in a harassment case, and (5) provides a statement that retaliation will not be tolerated"); *Frederick,* 246 F.3d at 1314–15 (the employer "was required to show that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect," and finding that jury questions were presented where it was undisputed that the employer had a sexual harassment policy, but there were material issues of disputed fact regarding what the employer's complaint procedures were during the relevant period); *Gentry,* 238 F.3d at 847–48 ("[A] sexual harassment policy must provide for 'effective grievance mechanisms'. . . . The policy itself should provide a meaningful process whereby an employee can express his or her concerns regarding an individual within a working environment," examining whether the policy was posted, whether the persons to whom harassment could be reported were identified, and whether it was clear who fit the definition of a person to whom harassment could be reported); *Madray v. Publix Supermarkets, Inc.,* 208 F.3d 1290, 1298–99 (11th Cir.) (reading *Faragher* to hold, in part, "that dissemination of an employer's anti-harassment policy was fundamental to meeting the requirement for exercising reasonable care in preventing sexual harassment," and that the policy must include reasonable complaint procedures, and factors impacting the reasonableness of the complaint procedures include "[t]he employer's size, location, geographic scope, organizational structure, and industry segment," and finding the policy adequate where "the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to assessable, designated representatives"), *cert. denied,* 531 U.S. 926, 121 S.Ct. 303, 148 L.Ed.2d 243 (2000).

The policy statement that the parties agree was included in the plaintiffs' packet of information at the start of their employment, which the court will describe as the "Handbook Policy," states the following:

TO WHOM IT MAY CONCERN:

JOSEPH P. McGUIRE, Ph.D., HAS BEEN APPOINTED THE EQUAL EMPLOYMENT OPPORTUNITY OFFICER FOR CESSFORD CONSTRUCTION COMPANY. HE WILL HANDLE ALL COMPLAINTS WHICH ALLEGE DISCRIMINATION BECAUSE OF RACE, RELIGION, SEX, COLOR, AGE, NATIONAL ORIGIN, CREED OR DISABILITY.

THIS COMPANY IS BOUND TO LIVE UP TO THE PROVISIONS OF

THE CIVIL RIGHTS ACT OF 1964 AND THE CURRENT EXECUTIVE ORDER RELATING TO EQUAL EMPLOYMENT OPPORTUNITY. ANYONE WHO BELIEVES HE OR SHE HAS BEEN DISCRIMINATED AGAINST, SHOULD REPORT THIS FACT PROMPTLY TO THE ASSIGNED COMPANY E.E.O. OFFICER.

IT IS THE POLICY OF CESSFORD CONSTRUCTION COMPANY TO MAKE "REASONABLE ACCOMMODATIONS TO THE KNOWN PHYSICAL OR MENTAL LIMITATIONS OF AN OTHERWISE QUALIFIED INDIVIDUAL WITH A DISABILITY WHO IS ANY APPLICANT OR EMPLOYEE."

CESSFORD CONSTRUCTION COMPANY

STEPHEN C. KRABBE

PRESIDENT

Defendant Cessford Construction Company's Appendix In Support Of Motions For Summary Judgment (Cessford's Appendix), 92. Cessford contends that it posted a similar policy at the trailer on the plaintiffs' job site, although the plaintiffs dispute that they ever saw such a policy. The "Posted Policy" states the following:

To All Employees:

It is the policy of this Company to assure that applicants are employed and that employees are treated during employment, without regard to their race, religion, sex, color, age, national origin, creed, or disability. Such action shall include: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship, pre-apprenticeship and/or on-the-job training.

It is also the policy of Cessford Construction Company to make "reasonable accommodations to the known physical or mental limitations of any otherwise qualified individual with a disability who is any applicant or employee."

All employees are encouraged to refer female and minority group applicants for employment.

The Equal Employment Opportunity Officer for Cessford Construction Company is:

Joseph P. McGuire, Ph.D.
1734 235th Street
State Center, Iowa 50247
Home Phone: (515) 483–4018
Office Phone: (515) 479–2695

Cessford's Appendix at 94.

It is plain that, under the standards identified above, Cessford's written policies are woefully inadequate, standing alone, to establish the "prevention" prong of the first element of the *Ellerth/Faragher* defense. The only channel identified for reporting harassment in either the Handbook Policy or the Posted Policy is the EEO officer, and the Handbook Policy provides no information on how to contact him. *See, e.g., Miller,* 80 F.Supp.2d at 1029. Worse yet, neither the Handbook Policy nor the Posted Policy defines "sexual harassment." *See, e.g., Kohler,* 244 F.3d at 1180. In *Smith v. First Union National Bank,* 202 F.3d 234 (4th Cir.2000), the plaintiff alleged that the employer's policy was "otherwise defective or dysfunctional," because the policy made it sound as though a sexual advance was required in order to constitute sexual harassment. *Smith,* 202 F.3d at 245. The Fourth Circuit Court of Appeals agreed that this reading was "entirely reasonable," and that the policy did not mention discrimination on the basis of gender. *Id.* The court concluded that, because of this inadequate

definition, "[w]e therefore cannot hold that, as a matter of law, [the employer's] policy was a sufficient means of preventing sexual harassment at [the company]." *Id.* Here, the Handbook Policy is inadequate for the "converse" reason, because it refers only to complaints of "discrimination," which the plaintiffs testified they understood to mean unfair treatment in jobs because of race or some other characteristic, not "harassment," an interpretation this court finds "entirely reasonable." Although the Posted Policy identifies in more detail particular sorts of employment actions in which employees are to be treated "without regard to their ... sex," it again fails to identify any circumstance constituting "harassment" rather than "discrimination." Moreover, there is no express statement that harassment or discrimination will not be tolerated—indeed, a statement that "[t]his company is bound to live up to" the anti-discrimination laws is a remarkably grudging way of suggesting that the company will not tolerate discriminatory or harassing conduct—no statement that employees who engage in such conduct will be disciplined, or that persons reporting such conduct will not be subjected to retaliation. *See, e.g., Miller,* 80 F.Supp.2d at 1029 (requiring an express anti-retaliation provision for a policy to be "effective"); *accord Kohler,* 244 F.3d at 1180. Thus, Cessford's written policies amount to no more than "mere promulgation" of policies, which are neither reasonably designed nor reasonably effectual. Therefore, standing alone, the written polices fail to establish the "prevention" prong of the first element of the defense. *See Harrison,* 248 F.3d at 1028; *Freder-*

*ick,* 246 F.3d at 1313–14; *Gentry,* 238 F.3d at 847; *Smith,* 202 F.3d at 244; *Brown,* 184 F.3d at 396.

However, in *Smith,* the Fourth Circuit Court of Appeals added that "[a] deficient policy does not necessarily negate an employer's affirmative defense in all cases." *Smith,* 202 F.3d at 245. Rather, the court looked at whether there was other conduct establishing the adequacy or inadequacy of the employer's efforts to prevent harassment.[2] Here, looking beyond Cessford's written policies, the court finds that, albeit perhaps just barely, Cessford has generated a genuine issue of material fact on the "prevention" prong of the first element of its affirmative defense. This is so, first, in light of record evidence that Cessford at least provided the plaintiffs with a copy of its sexual harassment policy in an information packet at the time the plaintiffs were hired and otherwise attempted to "disseminate" its policy by posting it at the job site. *See, e.g., Madray,* 208 F.3d at 1298–99 (reading *Faragher* to hold that dissemination of a policy is "fundamental" to the "prevention" prong). Of course, dissemination of a woefully inadequate policy provides only the merest inference of an adequate attempt to prevent harassment. However, Cessford has also pointed to record evidence that it employed a designated EEO officer and that it provided annual training sessions on sexual harassment for employees. *See, e.g., Miller,* 80 F.Supp.2d at 1029 (finding anti-harassment training for company supervisors was a requirement of an adequate policy to prevent harassment). The record demonstrates that Cessford had such annual training sessions, usually conducted by "outside"

---

**2.** In *Smith,* the additional evidence supported the plaintiff's contention that the employer had *not* taken reasonable steps to prevent harassment, where the additional evidence submitted by the plaintiff showed that the company discouraged complaining about a supervisor's harassing behavior. *Smith,* 202 F.3d at 245. The court concluded, "Employers cannot satisfy the first element of the *Faragher–Ellerth* affirmative defense if its management-level employees are discouraging the use of the complaint process." *Id.*

specialists, such as an outside human resources manager or corporate counsel, although the minutes of such meetings are vague as to precisely what was covered in the training sessions. Even if the plaintiffs never attended such training sessions, these sessions at least generate a jury question on whether the company reasonably attempted to prevent harassment by educating *potential harassers*. Thus, Cessford has generated a genuine issue of material fact that it exercised reasonable care to prevent sexual harassment. *See, e.g., Hocevar,* 223 F.3d at 736 (one prong of the first element of the defense is reasonable care to prevent sexual harassment).

Similarly, Cessford has pointed to record evidence that it took reasonable steps to correct the harassment of the plaintiffs once that harassment came to the attention of company officials. *See id.* (second prong of the first element of the defense is the "reasonable correction" prong). Cessford has pointed out that the EEO officer, Mr. McGuire, immediately called a meeting with Marks, the alleged harasser, Marks's supervisor, and the president of the company, to inquire into allegations of harassment; McGuire then interviewed the Strickers and other workers at the job site; McGuire reported to the company president, and the company president found the evidence sufficient to warrant Marks's prompt dismissal, despite his thirty years of service. Thus, Cessford has also generated genuine issues of material fact on the "reasonable correction" prong of the first element of the affirmative defense.

For their part, the plaintiffs have generated genuine issues of material fact as to the first element of the defense in response to Cessford's motion for summary judgment in its favor on the defense. As explained above, the plaintiffs point to record evidence that the policy was flawed, because it did not provide sufficient information about how to contact the company with a complaint of harassment and that the policy provided only one avenue for such contact, through the EEO officer. They also point to evidence that the only supervisors on the job site to whom immediate complaints about harassment could be made were Marks, the alleged harasser, and Marks's son. Furthermore, they contend that there is evidence that the dismissal of Marks was a sham, in that Marks was purportedly "fired" only until the matter had blown over, because Marks was permitted to continue using certain company equipment and to come to the job site. These contentions do not entitle the plaintiffs to summary judgment on the affirmative defense, however; rather, they merely generate inferences contrary to Cessford's position, demonstrating the necessity of jury determinations of facts and credibility, to decide whether or not Cessford has established the first element of its affirmative defense.

As to the second element of the defense, which examines the plaintiffs' conduct to determine whether they unreasonably failed to take advantage of any preventive or corrective opportunities provided by the company or "to avoid harm otherwise," *see, e.g., Hocevar,* 223 F.3d at 736, Cessford has also generated genuine issues of material fact. Cessford has pointed to evidence that the plaintiffs told *no* official of the company about the harassment, even if they were not provided with information about precisely *which* company officials they should contact or how to do so. Nevertheless, Nancy Stricker has generated a genuine issue of material fact that Cessford's policy was woefully inadequate and that, in the circumstances, there were no reasonable means provided by Cessford to make complaints about harassment through regular company channels. Also,

at a minimum, Stricker has generated a genuine issue of material fact as to whether she took reasonable steps "to avoid harm otherwise," *see id.*, by telling a co-worker, her boyfriend Marv Baker, about the harassment, and permitting Baker to convey concerns about Marks's conduct to the appropriate company official, Mr. McGuire.

While the undisputed record evidence is that Sharon Austin also made no attempt to report Marks's conduct towards her to anyone in the company through the Cessford sexual harassment reporting procedures or by any other means, a jury question is also presented on whether Austin's failure to do so was reasonable in light of the circumstances, including Cessford's inadequate anti-harassment policy. Austin also disputes Cessford's contention that she was simply undecided about whether to report Marks's conduct, and only made a complaint to the Iowa Civil Rights Commission after Marks had been fired, by asserting that her testimony was that she felt that going to anyone at Cessford was "out of the question." *See* Defendant Cessford Construction Company's Statement Of Material Facts In Support Of Motion For Summary Judgment Against Plaintiff Sharon Austin, ¶ 26; Plaintiff's Response To Defendants' Statement Of Material Facts, Statement Of Facts Re: Sharon Austin, ¶ 26. The deposition testimony to which Austin points is that she felt that going to Cessford was "out of the question," because "[i]t was too uncomfortable." Defendant Cessford's Appendix at 64, Austin deposition, p. 131, *ll.* 12–17. Cessford contends that, under *Shaw v. AutoZone, Inc.,* 180 F.3d 806, 813 (7th Cir.1999), *cert. denied,* 528 U.S. 1076, 120 S.Ct. 790, 145 L.Ed.2d 666 (2000), Austin's "discomfort" did not relieve her of the obligation to report harassment to the company so that the company would have the opportunity to investigate and respond to the harassment. Austin contends that *Shaw* only required her to report if there were "complaint mechanisms" available, which she contends were absent in this case owing to the inadequacies of Cessford's policy and procedures. The court concluded above that there were genuine issues of material fact as to the adequacy or inadequacy of Cessford's policy and procedures for handling sexual harassment complaints. Even if *Shaw* is given the broadest reading to which Cessford might be entitled, the court concludes that Austin has generated a jury question on whether or not it was reasonable for Austin not to attempt to report harassment to the company so that Cessford would have the opportunity to investigate and respond to the harassment.

Therefore, neither of the plaintiffs nor Cessford is entitled to summary judgment on the plaintiffs' federal claims of sexual harassment or Cessford's affirmative defense to those claims.

### 2. Retaliation

█ Cessford next contends that it is entitled to summary judgment on Nancy Stricker's and Sharon Austin's Title VII retaliation claims. As the Eighth Circuit Court of Appeals has explained, " 'To establish a prima facie case of Title VII retaliation, [the plaintiff] must show: (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal connection [existed] between her protected activity and the adverse employment action.' " *Sowell,* 251 F.3d at 684 (quoting *Bogren v. Minnesota,* 236 F.3d 399, 407 (8th Cir. 2000)). Cessford's motion for summary judgment on the plaintiffs' retaliation claims focuses on the lack of any genuine issue of material fact that the plaintiffs suffered any "adverse employment action."

More specifically, Cessford argues that Sharon Austin acknowledged in her deposition that she was not subjected to any retaliation. Cessford argues that Nancy Stricker's retaliation claim must fail, too, because the negative reaction of coworkers that she has identified as "retaliatory" does not amount to adverse employment action, and the fact that Mr. McGuire told coworkers that the Strickers were represented by an attorney, in the course of telling coworkers that the Strickers had been right to report harassment, does not identify any retaliatory conduct, even if it made Nancy Stricker feel "awkward," because Mr. McGuire's comment was not improper and was in the context of protecting the Strickers, not retaliating against them.

Stricker and Austin made no resistance to this portion of Cessford's motion for summary judgment, nor did they notify the court that they had no resistance or that they were withdrawing the claim. Thus, Cessford's contentions stand unchallenged. Moreover, Austin admitted Cessford's statement of undisputed fact that Austin does not believe that Cessford tried to retaliate against her after she filed her civil rights complaint and that "[n]o one gave her any grief or static because she had filed a civil rights complaint." *See* Defendant Cessford Construction Company's Statement Of Material Facts In Support Of Motion For Summary Judgment Against Plaintiff Sharon Austin, ¶ 31; Plaintiff's Response To Defendants' Statement Of Material Facts, Statement Of Facts Re: Sharon Austin, ¶ 31 (admitting ¶ 31 of the defendant's statement of facts). Similarly, Nancy Stricker admitted the following portions of Cessford's statement of undisputed facts:

39. After Nancy Stricker returned to work, she felt that the employees gave her and Tania "some looks." She overheard two employees talking in a convenience store about how it was just terrible what had been done to Mr. Marks. She had also heard a rumor that another female employee by the name of LeAnn had been upset that Mr. Marks had been fired. (Nancy Stricker dep. pp. 109–112, App. p. 20).

40. Later, Mr. McGuire had a meeting with all Cessford employees on the job site. He told the employees that what Nancy Stricker and her daughter had done was right. A lot of the employees were mad because Marv Baker had contacted Cessford about this matter. Mr. McGuire told them that what Mr. Baker had done was exactly what he was supposed to do. He also told all of the employees that if anyone believes they are being harassed, they should report it to the company and that both Nancy and Tania should not be criticized at all for what they had done. He made it clear that Cessford would not tolerate harassment of employees. Nancy's only objection to that meeting was that Mr. McGuire informed the employees that she and Tania had an attorney. (Nancy Stricker dep. pp. 112–114, App. pp. 20–21).

41. Nancy Stricker continued working for Cessford Construction Company until the project was concluded and she was not needed any longer. Nancy Stricker has no complaints about how Cessford treated her. (Nancy Stricker dep. pp. 114–115, App. p. 21)

*See* Defendant Cessford Construction Company's Statement Of Material Facts In Support Of Motion For Summary Judgment Against Plaintiff Nancy Stricker, ¶¶ 39–41; Plaintiffs' Response To Defendants' Statement Of Material Facts, Statement Of Facts Re: Nancy Stricker, ¶¶ 39–41 (admitting the pertinent paragraphs of defendant Cessford's statement of facts). Anger or ostracism from coworkers, at

least in the circumstances presented here, are insufficient to generate a genuine issue of material fact on retaliation. *See Williams v. City of Kansas City, MO.,* 223 F.3d 749, 754 (8th Cir.2000); *Scusa v. Nestle U.S.A. Co., Inc.,* 181 F.3d 958, 969–70 (8th Cir.1999). In light of the plaintiffs' admissions and their failure to designate any evidence generating a contrary genuine issue of material fact, *see* FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325, Cessford is "entitled to judgment as a matter of law" on Stricker's and Austin's federal retaliation claims. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re TMJ Litig.,* 113 F.3d at 1492.

### C. State Statutory Claims

Nancy Stricker and Sharon Austin also assert sexual harassment and retaliation in violation of the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216, in Counts III and IV, respectively, of their complaint. These claims are asserted against both Cessford and individual defendant John Marks. Marks and Cessford seek summary judgment on these claims.[3]

#### 1. Sexual harassment

 Maintenance of a sexually hostile work environment not only violates federal law, but is a form of illegal sex discrimination under IOWA CODE § 216.6. *See Lynch v. City of Des Moines,* 454 N.W.2d 827, 833 (Iowa 1990) (interpreting IOWA CODE § 601A.6(1)(a), the former version of section 216.6). To establish a claim of a hostile work environment in violation of Iowa law, a plaintiff must show the following: (1) the plaintiff belongs to a protected class; (2) the plaintiff was subject to unwelcome sexual harassment; (3) the harassment was based upon sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. *Greenland v. Fairtron Corp.,* 500 N.W.2d 36, 38 (Iowa 1993); *Lynch,* 454 N.W.2d at 833. Also under Iowa law, as under federal law, where sexual harassment in the workplace is so pervasive and severe that it creates a hostile or abusive work environment, so that the plaintiff must endure an unreasonably offensive environment or quit working, the sexual harassment affects a condition of employment. *Lynch,* 454 N.W.2d at 834. The existence of a hostile or abusive working environment under Iowa law, as under federal law, must be established by the totality of the circumstances, and whether conditions are continuous, severe, and pervasive enough to rise to a violation of the Iowa Civil Rights Act is a question of fact. *Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 633 (Iowa 1990).

#### a. Individual liability

 Marks is correct, however, that the Iowa and federal laws prohibiting sexual harassment are not identical. As the Iowa Supreme Court explained in *Vivian v. Madison,* 601 N.W.2d 872 (Iowa 1999),

> The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating

---

**3.** Although Cessford argues only that the plaintiffs cannot generate genuine issues of material fact on their "sexual harassment" and "retaliation" claims, and cites only federal law in support of its arguments, without separately arguing the insufficiency of those claims under Iowa law, the court reads Cessford's summary judgment motion to attack these state-law claims as well, at least to the extent that the elements of the state and federal claims are coextensive.

the ICRA. *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983). Federal law, however, is not controlling. We look simply to the analytical framework utilized by the federal courts in assessing federal law and not to a substitution of the language of the federal statutes for the clear words of the ICRA. *Hulme v. Barrett,* 449 N.W.2d 629, 631 (Iowa 1989).

*Vivian,* 601 N.W.2d at 873. Furthermore,

In *Harbit v. Voss Petroleum,* 553 N.W.2d 329 (Iowa 1996), for example, we agreed with the logic propounded by a majority of the federal circuits in ruling that there was no individual liability for supervisors under Title VII. *Harbit,* 553 N.W.2d at 330. Title VII, however, differs from the ICRA in several key respects. First, Iowa Code section 216.6(1)(a) provides in pertinent part that:

It shall be an unfair or discriminatory practice for any:

a. *Person* to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex, national origin, religion or disability of such applicant or employee, unless based upon the nature of the occupation.

(Emphasis added.)

Title VII, on the other hand, states only that:

It shall be an unlawful employment practice for an *employer:*

1. To fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of an individual's

race, color, religion, sex, or national origin; . . . .

42 U.S.C. § 2000e–2 (emphasis added).

Second, the ICRA incorporates an aiding and abetting provision codified at section 216.11 under which:

It shall be an unfair or discriminatory practice for:

1. Any person to intentionally aid, abet, compel, or coerce another person to engage in any of the practices declared unfair or discriminatory by this chapter.

Iowa Code § 216.11.

Title VII contains no similar language.

Third, the remedial sections of the ICRA apparently extend beyond those found in Title VII in that a claimant may commence a cause of action for relief against a *person,* employer, employment agency, or labor organization alleged to have committed a discriminatory or unfair practice. Iowa Code § 216.15(1). Title VII does not authorize claims against persons. *See* 42 U.S.C. § 2000e–5(b).

*Vivian,* 601 N.W.2d at 873–74. Thus, while the plaintiffs cannot sue Marks individually for sexual harassment under Title VII, they can and have done so under the ICRA.

 Another difference between sexual harassment claims under Title VII and the ICRA is that the Iowa Supreme Court has never adopted the *Ellerth/Faragher* model for vicarious liability of an employer for sexual harassment by a supervisor, so that the *Ellerth/Faragher* affirmative defense does not yet appear to be available to sexual harassment claims under the ICRA. This court notes that, in *Kohler v. Inter–Tel Technologies,* 244 F.3d 1167 (9th Cir. 2001), the Ninth Circuit Court of Appeals predicted that the California Supreme Court would recognize the *Ellerth/Faragh-*

er affirmative defense under the California statute prohibiting sexual harassment. *Kohler*, 244 F.3d at 1171–76. The Ninth Circuit Court of Appeals also noted that "the majority of states that have addressed the question whether the affirmative defense applies to their antidiscrimination laws have adopted it." *Id.* at 1175 n. 5 (citing cases). However, in this case, none of the parties argues that the Iowa Supreme Court would recognize the *Ellerth/Faragher* affirmative defense as a defense under the ICRA. Rather, defendant Marks argues that the defense has never been recognized by the Iowa Supreme Court and therefore is inapplicable to claims of sexual harassment under the ICRA and the plaintiffs do not dispute that contention. Cessford never addressed any argument specifically at the plaintiffs' sexual harassment claims under the ICRA, and did not respond to Marks's contention that the *Ellerth/Faragher* defense has never been recognized under Iowa law. The plaintiffs dispute only Marks's contention, which he argues follows from the inapplicability of the *Ellerth/Faragher* defense, that they must prove that *Cessford* knew of should have known of the harassment in order to find *Marks* liable under Iowa law. Therefore, because this court is not squarely presented with the question, it makes no prediction on whether or not the Iowa Supreme Court would recognize the *Ellerth/Faragher* affirmative defense under Iowa law. The court will instead take Iowa law on this point as it now finds it. Therefore, as indicated above, under Iowa law, an employer's liability for sexual harassment perpetrated by coworkers and supervisors depends upon whether the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action, *Greenland*, 500 N.W.2d at 38; *Lynch*, 454 N.W.2d at 833—*i.e.*, under Iowa law, employer liability for harassment by a supervisor depends upon what the United States Supreme Court described in *Faragher* as a "negligence" standard of employer liability, as opposed to a "vicarious liability" standard. *Faragher*, 524 U.S. at 789 & 810, 118 S.Ct. 2275 (identifying the "knew or should have known" standard as a negligence standard for employer liability that is an alternative, under federal law, to the vicarious liability standard established in that case).

The court turns next to Marks's contention that the plaintiffs must also prove that their employer, Cessford, knew or should have known of sexual harassment by Marks in order to find *Marks* individually liable for his harassing conduct under Iowa law. Because this argument is squarely presented to the court, the court has found no decision of the Iowa Supreme Court addressing this precise question, and the parties here have identified no such decision, the court must "predict how the state supreme court would resolve the issue if faced with it." *See State Farm Fire & Cas. Co. v. Ewing*, 258 F.3d 737, 739 (8th Cir.2001) (page references unavailable). The court concludes that the Iowa Supreme Court would reject Marks's assertion that the plaintiffs must prove that their employer knew or should have known of his harassment in order for him to be held individually liable under Iowa law.

Contrary to Marks's argument, Iowa law defines unfair or discriminatory conduct in terms of what "a person" is forbidden to do, and furthermore, provides for a cause of action against "a person" for relief from sexual harassment. *See Vivian*, 601 N.W.2d at 873–74 (citing Iowa Code §§ 216.6(1)(a) and 216.15(a), respectively). Thus, a logical reading of the statute is that Marks's individual liability depends entirely upon his own conduct and knowledge, not upon the knowledge or

conduct of his and the plaintiffs' employer, Cessford. Moreover, where the statute imposes liability on "a person," to the extent that the Iowa Supreme Court would require the plaintiffs to prove a "knew or should have known" element to establish Marks's liability for sexual harassment, the court believes that the Iowa Supreme Court would require the plaintiffs to prove that *Marks* knew or should have known of the harassment and failed to take prompt remedial action. *Cf. Greenland*, 500 N.W.2d at 38 (defining the last element of a claim of sexual harassment under Iowa law in terms of whether "an employer" knew or should have known of the harassment, but failed to take prompt remedial action, when the statute in fact identifies "a person" or "employer" as forbidden to engage in certain conduct and authorizes a cause of action against "a person" or "employer"); *Lynch*, 454 N.W.2d at 833 (same).

At the oral arguments on the cross-motions for summary judgment, Marks's counsel was unable to articulate any persuasive common-sense or policy reason for requiring a plaintiff asserting sexual harassment in violation of Iowa law against an individual supervisor to prove that the supervisor's *employer* knew or should have known of the supervisor's actions. For example, counsel argued that it was appropriate to acknowledge the employer-employee relationship in the proof of the harassment claim. However, this argument plainly fails where the statute defines prohibited conduct in terms of what "a person" cannot do, not just what "an employer" cannot do. *See Vivian*, 601 N.W.2d at 873–74. In other words, where the legislature was willing to impose liability on an individual for employment discrimination only on the basis of the workplace relationship between the harasser and the victim, there is no reason to suppose that the employer-employee relationship between the harasser and the employer had to be "acknowledged" in determining the individual liability of the harasser.

Therefore, the court concludes that, under Iowa law, in order to prove individual liability of a supervisor for sexual harassment, the plaintiff is not required to prove that the plaintiff's *employer* knew or should have known of the harassment by the supervisor; rather, to the extent that the knowledge element applies to such a claim, the plaintiff must prove that the *supervisor* knew or should have known of the harassment and failed to take prompt remedial action.

### b. Evidence of harassment

■ As to the first four elements of their claim of sexual harassment in violation of Iowa law—that the plaintiff (1) was a member of a protected class who (2) was subjected to unwelcome sexual harassment that (3) was based upon sex and (4) that affected a term, condition, or privilege of employment, *see Greenland*, 500 N.W.2d at 38; *Lynch*, 454 N.W.2d at 833—the plaintiffs have generated genuine issues of material fact as to both Cessford and Marks, just as they have generated genuine issues of material fact on the identical elements of their federal claims as to Cessford, where the conduct in question on both the state and federal claims is *Marks's* alleged harassment. However, the *Ellerth/Faragher* affirmative defense Cessford asserts to federal harassment claims appears to be inapplicable to such claims under the ICRA. Thus, the question for the viability of the plaintiffs' Iowa claims of sexual harassment becomes whether the plaintiffs can generate genuine issues of material fact that Cessford, on the one hand, and Marks, on the other, knew or should have known of the harass-

ing conduct, but failed to take prompt remedial action. *See supra.*

The plaintiffs do not contend that Cessford knew of Marks's harassment of them, where they acknowledge that they did not tell any company official about it and have not identified any way in which Cessford supposedly learned of Marks's conduct toward them. Instead, they assert that Cessford *should have known* of Marks's potential for harassment, because his immediate supervisor had received warnings that Marks had proclivities for inappropriate conduct toward women and had received warnings about Marks from previous complaints by a female motorist, Ms. Poe, and another employee, Ms. Zesch. The court agrees that, although perhaps just barely, the plaintiffs have raised the necessary inference of Cessford's knowledge and failure to act to prevent Marks's sexually harassing conduct.

The matter is clearer with regard to Marks's knowledge of his harassing conduct and his failure to take prompt remedial action. The plaintiffs have plainly identified record evidence that Marks knew or should have known that his conduct was offensive and sexually harassing, where he had received sexual harassment training from the company, the plaintiffs responded negatively to his advances, and told him to stop it, and he nevertheless repeated conduct he knew or should have known the plaintiffs found offensive.

Therefore, neither Cessford nor Marks is entitled to summary judgment on Nancy Stricker's and Sharon Austin's claims of sexual harassment in violation of the ICRA in Count III of their complaint.

### 2. *Retaliation*

█ The ICRA also prohibits retaliation for reporting sexual harassment. IOWA CODE § 216.11(2). A *prima facie* case of retaliation under the ICRA consists

of the following elements: (1) the plaintiff was engaged in statutorily protected activity; (2) she suffered adverse employment action; and (3) a causal connection existed between the first two factors. *City of Hampton v. Iowa Civil Rights Com'n,* 554 N.W.2d 532, 535 (Iowa 1996) (citation omitted). The causation standard has been characterized as a high one, because the causal connection must be a 'significant factor' motivating the adverse employment decision. *Id.* (citation omitted); *see also Teachout v. Forest City Community Sch. Dist.,* 584 N.W.2d 296, 301 (Iowa 1998). In light of the identity of these elements with the elements of a *prima facie* case of retaliation under Title VII, and the failure of the plaintiffs to generate any genuine issues of material fact that they were subjected to retaliation, as discussed above in reference to their federal retaliation claim, Cessford and Marks are entitled to summary judgment on the plaintiffs' retaliation claims under the ICRA.

### D. *State Common–Law Claims*

█ Because the plaintiffs have withdrawn their state common-law claim of intentional infliction of emotional distress, and Marks does not seek summary judgment on their claim of battery, the state common-law claims at issue on Cessford's and Marks's motions for summary judgment are the claim in Count V against Cessford for negligent retention and supervision of Marks, and the claim in Count VII against Marks for assault. The court will consider these claims in turn.

### 1. *Negligent supervision*

In support of its motion for summary judgment on the plaintiffs' negligent retention and supervision claim, Cessford contends that there is absolutely no evidence that it should have had any concerns about hiring Marks thirty years ago and that it

had no basis for concern about his conduct at the time the plaintiffs allegedly suffered harassment, because the plaintiffs never notified Cessford of Marks's harassment. Cessford contends further that previous complaints about Marks by a motorist, Ms. Poe, and another employee, Ms. Zesch, cannot provide a basis for a negligent supervision claim, when both complaints were groundless, because the motorist's criminal complaint before an Iowa court was dismissed and the Iowa Civil Rights Commission dismissed Ms. Zesch's complaint. Cessford contends further that this claim is preempted by the ICRA, as it is based entirely on conduct prohibited by the ICRA, and thus, does not state an independent claim.

The plaintiffs counter that a negligent retention and supervision claim has nothing to do with what the employer knew at the time it hired the employee who engaged in misconduct, but is instead premised on failure to prevent Marks's wrongful conduct at issue here, despite knowledge of his propensity for sexually aggressive behavior gained during the course of his employment. They contend further that this claim is not preempted by the ICRA, because Iowa courts have recognized that claims of assault and battery are separate and independent from a sexual harassment claim, and thus such misconduct provides a separate and independent basis for a negligent retention and supervision claim based on failure to prevent an assault or battery.

 In *Godar v. Edwards*, 588 N.W.2d 701 (Iowa 1999), the Iowa Supreme Court relied on RESTATEMENT (SECOND) OF AGENCY § 213 in recognizing " 'a claim by an injured third party for negligent hiring.' " *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 52–53 (Iowa 1999) (citing *Godar*, 588 N.W.2d at 709). As the court explained in *Schoff,*

[In *Godar*,] [w]e held "that an employer has a duty to exercise reasonable care in hiring individuals, who, because of their employment, may pose a threat of injury to members of the public." [*Godar*, 588 N.W.2d at 709.] *This duty was extended to negligent retention and negligent supervision of employees. Id.*

*Schoff*, 604 N.W.2d at 53 (emphasis added). Under Iowa law, "the torts of negligent hiring, supervision, or training 'must include as an element an underlying tort or wrongful act committed by the employee.' " *Id.* (quoting *Haverly v. Kaytec, Inc.*, 169 Vt. 350, 738 A.2d 86, 91 (1999), and citing RESTATEMENT (SECOND) OF AGENCY § 213). In *Godar*, the Iowa Supreme Court stated the elements of a claim of negligent *hiring* as follows: " '(1) that the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time of hiring; (2) that through the negligent hiring of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused the resulting injuries; and (3) that there is some employment or agency relationship between the tortfeasor and the defendant employer.' " *Godar*, 588 N.W.2d at 708–09 (quoting 27 AM. JUR.2D EMPLOYMENT RELATIONSHIP § 473, at 913–14 (1996)). Although the court in *Godar* did not articulate the elements of a negligent retention or supervision claim— as distinguishable from a negligent hiring claim—its analysis indicates that for such claims, the "knowledge" element would concern what the employer knew *at the time of the alleged wrongful conduct* by the employee. *See id.* at 709 ("The evidence does not show any reason for school district officials to be suspicious of Edwards' interaction with students either on or off school district premises. In fact, the superintendent testified that it was normal for Edwards to be present in the schools

and to have interaction with students."). Recasting the elements identified in *Godar* to suit the circumstances of a negligent retention or supervision claim, the court concludes that the elements the plaintiffs here must prove are the following: (1) the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct; (2) through the negligent retention or supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused injuries to the plaintiff; and (3) there is some employment or agency relationship between the employee and the defendant employer. *Cf. Godar*, 588 N.W.2d at 708–09.

The court finds that, contrary to Cessford's assertions, the plaintiffs have generated genuine issues of material fact on the "knowledge" element of this claim. Although the apparently groundless complaints of Ms. Poe and Ms. Zesch provide only the slightest of inferences that Marks was unfit or had dangerous characteristics in his behavior towards women, more telling is the inference to be drawn from information received by Marks's supervisor from other supervisors and employees that Marks had inappropriate proclivities in his behavior towards female employees. For the same reasons the court found that, albeit perhaps just barely, the plaintiffs had generated genuine issues of material fact on the "knowledge" element of their Iowa sexual harassment claims against Cessford, the court also finds that they have generated genuine issues of material fact on the "knowledge" element of their negligent retention and supervision claims.

 This leaves the question of whether these claims are preempted by the ICRA. As the Iowa Supreme Court explained, preemption by the ICRA occurs unless the claims are separate and independent, and therefore incidental, causes of action. *Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 (Iowa 1993); *Grahek v. Voluntary Hosp. Coop. Ass'n of Iowa, Inc.*, 473 N.W.2d 31, 34 (Iowa 1991); *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 639 (Iowa 1990); *see also Thomas v. St. Luke's Health Sys., Inc.*, 869 F.Supp. 1413, 1438–39 (N.D.Iowa 1994), *aff'd*, 61 F.3d 908, 1995 WL 416214 (8th Cir.1995). The claims are not separate and independent when, under the facts of the case, success on the claim not brought under chapter 216 requires proof of discrimination. *Greenland*, 500 N.W.2d at 38. As the plaintiffs point out, in *Greenland*, the Iowa Supreme Court concluded that claims for assault and battery, although based on sexual touching, were not preempted by the ICRA, because "claims for assault and for battery are not bound up in [the plaintiffs'] discrimination complaints," but instead "are complete without any reference to discrimination." *Greenland*, 500 N.W.2d at 39. Similarly, where the negligent retention and supervision claim must be based on wrongful or tortious conduct committed by the employee, *see Schoff*, 604 N.W.2d at 53, the plaintiffs here have alleged assault and battery as underlying torts, and those torts are not themselves preempted by the ICRA, *see Greenland*, 500 N.W.2d at 39, the plaintiffs' negligent retention and supervision claims are not preempted by the ICRA, but are instead separate and independent from the ICRA claims.

Cessford is not entitled to summary judgment on the plaintiffs' negligent retention and supervision claims.

### 2. Assault

 Although he does not seek summary judgment on the plaintiffs' battery claims against him, Marks seeks summary judgment on their assault claims. This

court has explained the tort of assault under Iowa law as follows:

"It is ... elementary that one upon whom an unjustified assault is made has a civil cause of action for damages against the person making the assault." *In re Cuykendall's Estate*, 223 Iowa 526, ——, 273 N.W. 117, 119 (1937). As this statement suggests, Iowa courts have sometimes looked to the criminal code's definition of assault as defining the elements of assault in civil actions for damages or other relief. *See id.; see also Bacon v. Bacon*, 567 N.W.2d 414, 417 (Iowa 1997) (in an action for relief from domestic abuse under Iowa Code Ch. 232, domestic abuse under Iowa Code § 236.2 is defined as assault within the meaning of Iowa Code § 708.1). Although "[a]ssault can be committed in several ways," *Bacon*, 567 N.W.2d at 417, the pertinent definitions here, as in *Bacon*, are as follows:

A person commits an assault when, without justification, the person does any of the following:

(1) Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act.

(2) Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act.

Iowa Code § 708.1(1) & (2); *accord Bacon*, 567 N.W.2d at 417. These elements are comparable to the elements of the tort of assault as defined by the Restatement (Second) of Torts:

§ 21. Assault

(1) An actor is subject to liability to another for assault if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) the other is thereby put in such imminent apprehension.

Restatement (Second) of Torts § 21; *see Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 & n. 4 (Iowa 1993) (looking to the Iowa Civil Jury Instructions and the Restatement (Second) of Torts for the elements of assault to determine whether a civil assault claim is preempted by the Iowa Civil Rights Act); Iowa Civil Jury Instructions Nos.1900.1 & 1900.2 (defining assault based on Restatement (Second) of Torts §§ 21, 31, 32). Thus, assault consists of " 'acts threatening violence [or offense] to the person of another; coupled with the means, ability, and intent to commit the violence [or offense] threatened.' " *Schneider v. Middleswart*, 457 N.W.2d 33, 35 (Iowa Ct.App.1990) (quoting *Holdorf v. Holdorf*, 185 Iowa 838, 841, 169 N.W. 737, 738 (1918)); *accord Bacon*, 567 N.W.2d at 417–18 (assault for the purposes of a civil action for domestic abuse consists of the "intent" element and "the apparent ability to execute the act" element). The focus is on the offender's intent, not the victim's expectations. *Bacon*, 567 N.W.2d at 418.

*Doe v. Hartz*, 52 F.Supp.2d 1027, 1052 (N.D.Iowa 1999).

Marks contends that the plaintiffs cannot prevail on their assault claims, because the "threatening words" upon which their assault claims are based did not involve threats of offensive or injurious bodily contact and were not uttered in circumstances in which there was any present ability for Marks to fulfill any threat of physical contact. The plaintiffs contend that, on numerous occasions, Marks en-

gaged in physical contact that would be insulting or offensive to a reasonable person, and that, given Marks's history of unwanted physical contact with female employees, there was a reasonable possibility that Marks could carry out the threatened offensive physical contacts.

To the extent that Marks suggests that an assault cannot be based on actual physical contact, he is incorrect. *See Wilker v. Wilker*, 630 N.W.2d 590, 596–97 (Iowa 2001) ("It is clear that by Bill putting Timothy in a 'bear hug,' he committed an assault on Timothy. Such conduct was committed in Timothy's home and was unwelcome. The greater weight of the testimony shows that Bill restrained Timothy because he wanted to get Stephen out of the house, not because he was afraid Timothy was a threat. Timothy also testified that Angie physically pushed him down— an act that would be offensive to Timothy. Given these factual findings, and placing considerable weight on the district court's credibility determinations, there is sufficient evidence to establish by a preponderance of the evidence that an assault occurred."); *see also* IOWA CODE § 708.1(1) (defining assault, *inter alia*, as "*[a]ny act which is intended to cause pain or injury to* ... another") (emphasis added). Furthermore, the plaintiffs have generated genuine issues of material fact that Marks had the present ability to carry out further threatened physical contact, suggested by either verbal threats or unwanted physical contact, where he had engaged in improper or offensive touching on the job site in the past. Marks has done no more than generate a jury question with his assertions that the circumstances were such that no reasonable person could have believed he would carry out any threats. Although he contends that the circumstances included the fact that he was in a truck at the time he made purported "ver-

bal assaults" and could not simply get out and have sex with the plaintiffs, that argument is better put to a jury for determination of both the circumstances and the credibility of the threat.

Therefore, Marks is not entitled to summary judgment on the plaintiffs' assault claims.

### III. CONCLUSION

One of the plaintiffs in this case has accepted an offer of judgment, so that claims she has asserted are no longer at issue. The remaining plaintiffs have also withdrawn their claims of tortious infliction of emotional distress. Although genuine issues of material fact preclude summary judgment on the parties' cross-motions for summary judgment on most of the remaining claims of the remaining plaintiffs, some of those claims are ripe for summary judgment, as explained herein.

THEREFORE,

1. In light of plaintiff Tania Stricker's acceptance of the defendants' offer of judgment, those portions of Counts I through VIII pertaining to Tania Stricker and Counts IX and X in their entirety are no longer at issue. The parties' cross-motions for summary judgment or partial summary judgment with regard to the claims of Tania Stricker are **denied as moot**. The court finds that there is no just reason for delay in entering judgment in favor of Tania Stricker. Therefore, the Clerk of Court shall enter judgment in favor of Tania Stricker pursuant to Rules 54(b) and 68 of the Federal Rules of Civil Procedure.

2. Count VI (tortious infliction of emotional distress) is **dismissed** upon the

plaintiffs' withdrawal of the claims asserted therein.

3. The June 13, 2001, motion for partial summary judgment by plaintiffs Nancy Stricker and Sharon Austin on defendant Cessford's *Ellerth/Faragher* affirmative defense is **denied**.

4. Defendant Cessford's July 2, 2001, motions for summary judgment are **granted in part and denied in part**. The motions are **granted** as to the claims of Nancy Stricker and Sharon Austin in Count II (retaliation in violation of Title VII) and Count IV (retaliation in violation of the ICRA). The motions are **denied** as to the claims of Nancy Stricker and Sharon Austin in Count I (sexual harassment in violation of Title VII), Count III (sexual harassment in violation of the ICRA) and Count V (negligent retention and supervision).

5. Defendant Marks's July 2, 2001, motion for partial summary judgment is **granted in part and denied in part**. The motion is **granted** as to the claims of Nancy Stricker and Sharon Austin in Count IV (retaliation in violation of the ICRA) and **denied** as to the claims of Nancy Stricker and Sharon Austin in Count III (sexual harassment in violation of the ICRA) and Count VII (assault).

**IT IS SO ORDERED.**